**TREEHOUSE LAW, LLP**
Ruhandy Glezakos (SBN 307473)
Benjamin Heikali (SBN 307466)
Joshua Nassir (SBN 318344)
2121 Avenue of the Stars, Suite 2580
Los Angeles, CA 90067
Telephone: (310) 751-5948
rglezakos@treehouselaw.com
bheikali@treehouselaw.com
jnassir@treehouselaw.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Pearl Magpayo, individually, and on behalf of all others similarly situated,

        Plaintiff,

      v.

Walmart Inc.,

        Defendant.

CASE NO.: 3:24-cv-01350

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Pearl Magpayo ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through her attorneys, brings this Class Action Complaint against Walmart Inc. ("Defendant"), based upon personal knowledge as to herself, and upon information, investigation and belief of her counsel.

## **INTRODUCTION**

1.     It should go without saying that reasonable consumers associate heart health with the prevention of heart disease.

2.     One person dies every 33 seconds in the United States from cardiovascular disease.[1] Coronary heart disease is the most common type of cardiovascular disease, killing 375,476 people in 2021.[2] About 1 in 20 adults aged 20 and older have coronary heart disease (about 5%).[3] In 2021, about 2 in 10 deaths from coronary heart disease happen in adults less than 65 years old.[4]

3.     This national health problem has spurred an entire industry dedicated to marketing Omega-3 supplements, often with marketing known to mislead reasonable consumers.

4.     "The sale of fish oil supplements is a multibillion-dollar industry, and many people take fish oil capsules daily, believing the omega-3 fatty acids they

---

[1] *Heart Disease Facts*, Ctrs. Disease Control & Prevention (May 15, 2023), https://www.cdc.gov/heartdisease/facts.htm.

[2] *Id*.

[3] *Id*.

[4] Lindsey Bever, *Marketers Overstate Fish Oil Claims for Heart Health, Study Shows*, Wash. Post (Aug. 23, 2023), www.washingtonpost.com/wellness/2023/08/23/fish-oil-supplements-heart-benefits/.

contain are good for their overall health, particularly for their heart."[5]

5.     "Most research shows that over-the-counter fish oil supplements don't offer cardiovascular benefits, but that hasn't stopped marketers from touting them for heart health, a new study shows."[6]

6.     In a study by JAMA Cardiology, the labels of more than 2,800 fish oil supplements were examined.[7]

7.     It was found that a majority of fish oil supplements make claims health claims, often related to heart health, even though there is a lack of trial data showing efficacy, and that such statements increased the potential for consumer misinformation. [8]

8.     Indeed, even the U.S. Department of Health and Human Services, National Center for Complementary and Integrative Health ("NIH") has stated that "[r]esearch indicates that omega-3 supplements don't reduce the risk of heart disease."[9]

---

[5] *Id.*; *see also* ASCEND Study Collaborative Grp., *Effects of n−3 Fatty Acid Supplements in Diabetes Mellitus*, 379 N. Eng. J. Med. 1540 (Oct. 18, 2018), https://www.nejm.org/doi/full/10.1056/nejmoa1804989 (finding that in a randomized trial of more than 15,000 patients with diabetes, a risk factor for cardiovascular disease, the risk of a serious cardiovascular event was not significantly different between those who were taking an omega-3 supplement and those who were not).

[6] Bever, *supra* note 4.

[7] Joanna N. Assadourian et al., *Health Claims and Doses of Fish Oil Supplements in the US*, 8(10) JAMA Cardiology 984, 986 (Aug. 23, 2023), https://jamanetwork.com/journals/jamacardiology/article-abstract/2808769?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamacardio.2023.2424.

[8] *Id.* at 985.

[9] *Omega-3 Supplements: In Depth*, Nat'l Ctr. Complimentary & Integrative Health ("NIH") - U.S. Dep't Health & Hum. Servs. (Apr. 2018),

-2-

9.     "However, people who eat **seafood** one to four times a week are less likely to die of heart disease." (emphasis added).[10]

10.     Despite the lack of evidentiary support, companies like Defendant continue to make false and misleading claims related to Omega-3 supplements because reasonable consumers are particularly vulnerable to such claims.

11.     As stated by registered dietitian Scott Keatley, co-owner of Keatley Medical Nutrition Therapy, "Many people take fish oil because of longstanding beliefs about its potential health benefits, particularly for heart health."[11]

12.     "*The supplement industry*, anecdotal evidence and earlier studies *have often promoted these benefits*. Once a narrative becomes deeply embedded in popular culture, it can be difficult to change, even when new evidence emerges."[12]

13.     This case involves an Omega-3 Supplement also touting purported heart health benefits—Defendant's Spring Valley Fish Oil Omega-3 supplement. The

---

https://www.nccih.nih.gov/health/omega3-supplements-in-depth (scroll down to heading "What Do We Know About the Effectiveness of Omega-3s" and click on the "+" button to the right of "Heart Disease" subheading) ("A 2018 analysis of 10 major omega-3 supplementation studies (77,917 total participants, all at high risk of heart disease), each of which involved at least 500 participants and a treatment duration of at least a year, found no evidence that omega-3s could reduce the risk of fatal or nonfatal coronary heart disease.") (last visited March 2, 2024). *Id.* ("In 2016, the U.S. Government's Agency for Healthcare Research and Quality (AHRQ) did a comprehensive evaluation of 98 studies of omega-3s and heart disease, including both diet and supplementation studies. They did not find evidence that omega-3s can reduce the risk of heart attacks or death from heart disease.").

[10] *Id.*

[11] Korin Miller, *Most Fish Oil Supplements Make Unsupported Heart Health Claims, Finds New Study. Here's Why Experts Say Most People Can Skip Them.*, yahoo!life (Aug. 23, 2023), https://www.yahoo.com/lifestyle/fish-oil-supplements-heart-heart-study-150006741.html.

[12] *Id.*

Products' front label includes the following prominent heart health representations:

- "Omega-3"

- "Fish Oil is a source of Omega-3 fatty acids that support heart health"

- "Heart Health"

- A heart symbol

*See example below.*



14.     Collectively, the heart health representations lead reasonable consumers to believe the Products' Omega-3s support heart health. Unbeknownst to consumers, the heart health representations are false and misleading because the Products' Omega-3s do not support heart health (i.e., the Omega-3s in the Products do not reduce the risk of heart disease). As discussed in more detail below, this allegation is well supported by current studies on Omega-3 supplementation, and by leading authorities in the field of heart health like the NIH.

15.     The heart health representations also lead reasonable consumers to believe there is—at least some—conclusive research to show that the Products' Omega-3s reduce the risk of heart disease. Unbeknownst to consumers, there is no conclusive research to show that the Products' Omega-3s reduce the risk of heart disease.

16.     It should be noted that the U.S. Food and Drug Administration (the "FDA") has addressed this exact form of deception and taken tremendous efforts to ensure that supplements accurately communicate to consumers the level of scientific evidence that exists for a health claim.

17.     As discussed in more detail below, because the Products make health claims that lead reasonable consumers to believe the Products will reduce the risk of heart disease, Defendant was required by the FDA to include a disclaimer stating that "Supportive ***but not*** conclusive research shows that consumption of EPA and DHA Omega-3 fatty acids ***may*** reduce the risk of coronary heart disease." (emphasis added). This is because the FDA has found that health claims related to heart disease on Omega-3 supplements lack significant scientific agreement.

18.     While Plaintiff is not bringing claims to enforce the FDA's rules and regulations, the fact that the FDA requires such a disclaimer shows that reasonable

consumers can be misled about the level of scientific support that exists for a health claim.

19.     This is because consumers reasonably trust and rely on a supplement's health claims and believe that there must be at least some conclusive research before a company is allowed to make a health claim like—supports heart health.

20.     Because that is not the case, reasonable consumers have been misled by the Products' health claims.

21.     Plaintiff and other consumers purchased the Products and paid a price premium relying on the false and deceptive labeling, advertising, and marketing of the Products.

22.     Had Plaintiff and other consumers been aware that the Products do not support heart health, they would not have purchased the Products or would have paid significantly less for them.

23.     Also, had Plaintiff and other consumers known there is no conclusive research showing that the Products reduce the risk of heart disease, they would not have purchased the Products or would have paid significantly less for them.

24.     Accordingly, Plaintiff and Class members have been injured by Defendant's deceptive business practices.

## <u>JURISDICTION AND VENUE</u>

25.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure, there are thousands of proposed Class members, the aggregate amount in controversy exceeds $5,000,000 exclusive of

interest and costs, and Defendant is a citizen of a state different from at least some members of the proposed Classes, including Plaintiff.

26.     This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts in California, or otherwise intentionally avails itself of the markets within California, through its sale of goods and products (including the Products) in California and to California consumers.

27.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this case occurred in this District. Specifically, Plaintiff resides in this District and she purchased one of the Products at issue in this case in this District during the statute of limitations period.

## **PLAINTIFF**

28.     Plaintiff Pearl Magpayo is a citizen of California and currently resides in Hayward, California. During the relevant class period, including in or around May or June 2023, Plaintiff purchased the Spring Valley Omega-3 Fish Oil Soft Gels, Heart Health Dietary Supplement, 1000 mg from a Walmart in either Union City or San Leandro, California. Based on the representations "Heart Health," "Fish Oil is a source of Omega-3 fatty acids that ***support heart health***,"  "Omega-3," and the heart symbol on the front label of the Product, Plaintiff reasonably believed the Product would support heart health (i.e., that the Product would reduce the risk of heart disease). Had she known the Product does not support heart health, she would not have purchased it, or would have paid significantly less for it. As such, Plaintiff has been directly financially injured by Defendant's false and misleading labeling.

29.     Based on the Product's heart health representations, Plaintiff also reasonably believed there was conclusive research showing that consumption of the Product's Omega-3s would reduce the risk of heart disease. Had she known that there is no conclusive research showing that consumption of the Product's Omega-3s reduces the risk of heart disease, she would not have purchased the Product, or would have paid significantly less for it. As such, Plaintiff has been directly financially injured by Defendant's false and misleading labeling.

30.     Despite Defendant's misrepresentations, Plaintiff would purchase the Products, as labeled and marketed, if they actually supported heart health, and there was conclusive research supporting such a claim. Although Plaintiff regularly shops at stores that carry the Products, absent an injunction of Defendant's deceptive labeling, she will be unable to rely with confidence on Defendant's labeling and advertising of the Products in the future. Furthermore, while Plaintiff currently believes the Products' labeling and advertising is inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly abide by their heart health representations. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the heart health representations on the Products' front label and advertising. This uncertainty, coupled with her desire to purchase a Product supporting heart health, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the alleged misleading representations. In addition, other Class members will continue to purchase the Products, reasonably but incorrectly, believing that they support heart health, and that there is conclusive research supporting such a claim.

**DEFENDANT**

31.    Defendant is a Delaware limited liability company with its principal place of business in Bentonville, Arkansas. Defendant is an American multinational retail corporation that sells a variety of consumer goods, including supplements.

**FACTUAL ALLEGATIONS**

32.    At issue in this Complaint are the following Spring Valley Omega-3 Fish Oil products:

- Spring Valley Omega-3 Fish Oil Soft Gels, Heart Health Dietary Supplement, 1000 mg, 60 Count;

- Spring Valley Proactive Support Omega-3 Mini from Fish Oil Dietary Supplement, 1000 mg, 120 Count;

- Spring Valley Omega-3 Fish Oil For Heart and Brain Health, Dietary Supplement Soft gels, 1000 mg, 60 Count;

- Spring Valley Maximum Care Omega-3 from Fish Oil Eye Brain Bone & Heart Health Dietary Supplement Soft gels, 2000 mg, 120 Count;

- Spring Valley Fish Oil Omega-3 General & Heart Health Dietary Supplement Soft gels, 500 mg, 60 Count, 120, & 180 count;

- Spring Valley Proactive Support Omega-3 from Fish Oil Heart General & Brain Health Dietary Supplement Soft gels, 1000 mg, 120 Count;

- Spring Valley Omega-3 Fish Oil Soft Gels, 1000 mg, 180 Count;

- Spring Valley Omega-3 Fish Oil Brain & Heart Health Dietary Supplement Soft gels, 2000 mg, 180 count; and

- Spring Valley Omega-3 Natural Lemon Flavor Dietary Supplement Twin Pack, 1000 mg, 360 count.

1  (collectively, the "Products").

2  33.    The front label of the Products tout purported heart health benefits with

3  the following heart health representations: (1) "Heart Health"; (2) a heart symbol; (3)

4  "Fish Oil is a source of Omega-3 fatty acids that support heart health"; and (4)

5  "Omega-3." *See image below.*

6

7  

8

9

10

11

12

13

14  34.    Unfortunately for consumers, Defendant engages in false and misleading

15  business practices to gain a competitive edge in the market, all at the expense of

16  unsuspecting consumers. Defendant accomplishes this by using front label

17  representations that lead reasonable consumers to believe the Products' Omega-3s

18  support heart health.

19

20  35.    Unbeknownst to consumers, the Products' heart health representations

21  are false and misleading because the Products' Omega-3s do not support heart health

22  (i.e., the Products' Omega-3s do not reduce the risk of heart disease). As discussed in

23  more detail below, this allegation is well supported by current studies on Omega-3

24  supplementation, and by reputable organizations in the field of heart health like the

25  NIH.

26

27

28

36.     Based on the Products' heart health representations, reasonable consumers are also led to believe there is—at least some—conclusive research to show that the Products' Omega-3s reduce the risk of heart disease.

37.     Unbeknownst to consumers, there is no conclusive research to show that the Products' Omega-3s reduce the risk of heart disease. In fact, as discussed in more detail below, "most [recent studies] found little or no evidence for a protective effect of omega-3 supplements against heart disease."[13]

## History Of Heart Disease and the Fish Oil Industry

38.     The rise of heart disease has spurred an entire industry dedicated to marketing Omega-3 supplements, often with marketing known to mislead reasonable consumers.

39.     Americans are rightly concerned about their heart health because one person dies every 33 seconds in the United States from heart disease. In fact, the most common type of heart disease, coronary heart disease, killed 375,476 people in 2021.

40.     In response, omega-3 supplements have skyrocketed in popularity, and created "a multibillion-dollar industry" that encourages people to "take fish oil capsules daily" because they "believe[] the omega-3 fatty acids they contain are good for their overall health, particularly for their heart."[14]

41.     Several news outlets have recently brought the effectiveness of omega-3 supplements into question. For example, the New York Post described fish oil

---

[13]  NIH, *supra* note 9.

[14]  Bever, *supra* note 4.

supplements as "worthless" and the health claims they make as "outrageous,"[15] while the Washington Post said that "the vagueness of the wording used by fish oil marketers could lead to misinformation about the role of the dietary supplement."[16]

### Studies Finding that Omega-3 Supplements Do Not Reduce the Risk of Heart Disease

42.    Studies show that although consumers have been led to believe that taking fish oil supplements will reduce the risk of heart disease, "multiple randomized clinical trials have shown no cardiovascular benefits to fish oil supplements."[17]

43.    Meta-analyses of supplementation with marine-derived omega-3 fatty acids have reached a similar conclusion. Finding, for example, that "marine-derived omega-3 fatty acids . . . had no significant association with reductions in fatal or nonfatal coronary heart disease or any major vascular events."[18]

44.    Similarly, another study found that: "Supplementation with n−3 fatty acids did not result in a lower incidence of major cardiovascular events or cancer than placebo."[19]

_____

[15] Marc Lallanilla, *Why Fish Oil Supplements Are Basically Worthless: Study*, N.Y. Post (Oct. 2, 2023), https://nypost.com/2023/10/02/why-fish-oil-supplements-are-basically-worthless-study/.

[16] Bever, *supra* note 4.

[17] Assadourian, *supra* note 7, at 985.

[18] Theingi Aung, *Associations of Omega-3 Fatty Acid Supplement Use with Cardiovascular Disease Risks: Meta-analysis of 10 Trials Involving 77 917 Individuals*, 3(3) JAMA Cardiology 225, 226 (Mar. 21, 2018) https://jamanetwork.com/journals/jamacardiology/fullarticle/2670752.

[19] JoAnn E. Manson et al*., Marine n−3 Fatty Acids and Prevention of Cardiovascular Disease and Cancer*, 830(1) N. Eng. J. Med. 23, 23 (Jan. 3, 2019), https://www.nejm.org/doi/10.1056/NEJMoa1811403.

-12-

45.    The U.S. Department of Health and Human Services, National Center for Complementary and Integrative Health ("NIH") states that "[r]esearch indicates that omega-3 supplements don't reduce the risk of heart disease."[20]

46.    In support, the NIH cites to two separate findings, including the 2018 meta-analysis discussed in paragraph 45 and the 2016 AHRQ study described below:

A 2018 analysis of 10 major omega-3 supplementation studies (77,917 total participants, all at high risk of heart disease), each of which involved at least 500 participants and a treatment duration of at least a year, found no evidence that omega-3s could reduce the risk of fatal or nonfatal coronary heart disease.

* * *

In 2016, the U.S. Government's Agency for Healthcare Research and Quality (AHRQ) did a comprehensive evaluation of 98 studies of omega-3s and heart disease, including both diet and supplementation studies. They did not find evidence that omega-3s can reduce the risk of heart attacks or death from heart disease.[21]

47.    "Several other analyses of the evidence have been done in the last few years (2012 or later), and like the 2018 analysis and the AHRQ report, most found little or no evidence for a protective effect of omega-3 supplements against heart disease."[22]

48.    In 2020, the STRENGTH Randomized Clinical Trial stated that its "findings [did] not support use of this omega-3 fatty acid formulation to reduce major adverse cardiovascular events in high-risk patients."[23]

---

[20] NIH, *supra* note 9.

[21] *Id.*

[22] *Id.*

[23] Stephen J. Nicholls et al., *Effect of High-Dose Omega-3 Fatty Acids vs Corn Oil on Major Adverse Cardiovascular Events in Patients at High Cardiovascular Risk: The*

49.     Based on such findings, several experts have debunked the myth that fish oil supplements are conclusively linked to heart health benefits. For example, in an interview with health.com, Timothy Jacobson, MD, chief cardiologist for Kaiser Permanente in the Northwest, stated that:

> "There have now been a large number of well-conducted studies which have not shown a cardiac benefit to taking over-the-counter fish oil supplements," . . .

> In fact, Jacobson said, taking fish oil could even have adverse effects for some people. "There is data these supplements may increase the risk of atrial fibrillation," he said. [24]

50.     Dr. Ann Marie Navar, associate professor of medicine at University of Texas Southwestern Medical School, states "as a preventive cardiologist, I see patients in clinic all the time taking fish oil with the belief it is helping their heart. They are often surprised when I tell them that randomized trials have shown no benefit for fish oil supplements on heart attacks or strokes."[25]

51.     Indeed, as stated in the Washington Post, "[m]ost research shows that over-the-counter fish oil supplements don't offer cardiovascular benefits, but that hasn't stopped marketers from touting them for heart health, a new study shows."[26]

---

*STRENGTH Randomized Clinical Trial*, 324(22) JAMA 2268, E1 (Nov. 15, 2020), https://jamanetwork.com/journals/jama/fullarticle/2773120.

[24] Sarah Garone, *Study: Majority of Fish Oil Supplements Make Unfounded Health Claims*, health.com (Aug. 29, 2023), https://www.health.com/fish-oil-supplements-for-heart-health-7852475.

[25] Miller, *supra* note 11.

[26] Bever, *supra* note 4.

52.    The lack of scientific support for heart health claims on fish oil supplements has led to a report from JAMA Cardiology examining the potential for consumer deception.

53.    In the report, the labels of more than 2,800 fish oil supplements were examined. The report found:[27]

- "One in 5 US adults older than 60 years takes fish oil supplements often for heart health despite multiple randomized clinical trials showing no data for cardiovascular benefit for supplement-range doses. Statements on the supplement labels may influence consumer beliefs about health benefits."

- Heart health claims (e.g., "promotes heart health") were the most common health claims made on fish oil supplements.

- Results of this cross-sectional study suggest that the majority of fish oil supplement labels make health claims, usually in the form of structure/function claims, that imply a health benefit across a variety of organ systems despite a lack of trial data showing efficacy.

- Results of this cross-sectional study suggest that fish oil supplement labels frequently include health claims in the form of structure/function claims that imply health benefits across a wide range of organ systems, increasing potential for consumer misinformation.

54.    The JAMA Cardiology report shows that not only do the Products' lack support for their heart health representations, but that Plaintiff and other reasonable consumers are in fact being misled.

---

[27] Assadourian, *supra* note 7, at 984.

## **The Products Mislead Consumers About the Level of**
## **Scientific Support that Exists for the Heart Health Representations**

55.     The commonly held belief that fish oil supplements reduce the risk of heart disease, coupled with the Products' heart health representations, results in many consumers being misled into believing there is—at least some—conclusive evidence to support the Products' heart health representations.

56.     R. Preston Mason, a member of Cardiovascular Division at Brigham and Women's Hospital and Harvard Medical School since 2002, wrote that:

> Consumers have been told so many times that dietary fish oil supplements promote heart health that it seems to be accepted as factual. But this conventional thinking is not supported by the science. After decades of promises that fish oil "may work," the lack of demonstrated benefit leads me to conclude that consumers are wasting their money on supplements in an effort to reduce cardiovascular risk.[28]

57.     For such reasons, the FDA has taken significant precautions to ensure that consumers are not misled about the level of scientific evidence that exists for a health claim. This is especially true for the health claims at issue in this case: (1) "Heart Health"; (2) a heart symbol; and (3) "support[s] heart health."

58.     Under 21 C.F.R. § 101.14, a health claim is defined as any claims, written statements, symbols, or vignettes that characterize the relationship of any supplement to a disease or health-related condition.

59.     The FDA recognizes that supplements can make either express health claims or ***implied*** health claims. 21 C.F.R. § 101.14.

---

[28] R. Preston Mason, *The False Promise of Fish Oil Supplements*, Scientific American (Aug. 22, 2019), https://blogs.scientificamerican.com/observations/the-false-promise-of-fish-oil-supplements/.

-16-

60.    An implied health claim is defined as "statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition." *Id*.

61.    Examples of implied health claims include written statements that simply include the word "heart." *See id*.[29]

62.    Certain symbols—such as "**a heart symbol**," can also convey an implied health claim.[30]

63.    The FDA has specifically stated that simply using the word heart on a supplement can imply a health claim relating to cardiovascular disease[31]:

> FDA does agree, however, that under §101.14(a)(1), a dietary supplement name that included the word "heart" could be a health claim, depending on the context. Thus, a dietary supplement could be called "HeartTabs" if its claim was "to maintain healthy circulation," or some other role related to the structure or function of the heart that did not imply treatment or prevention of disease. ***If, however, the product name was not qualified by any further claim in the labeling, the product could be considered, under §101.14(a)(1), to be intended for treatment or***

---

[29] 21 C.F.R. § 101.14(a)(1) ("Health claim means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including 'third party' references, written statements (e.g., a brand name including a term such as 'heart'), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition.")

[30] *Id.* ("Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition.").

[31] Cardiovascular disease is the umbrella term, which includes heart disease. *See* editorial staff, *What Is Cardiovascular Disease?*, Am. Heart Ass'n (last reviewed Jan. 10, 2024), https://www.heart.org/en/health-topics/consumer-healthcare/what-is-cardiovascular-disease.

*prevention of cardiovascular disease.*[32]

64.    As to the use of a heart symbol on supplements, the FDA has stated that it is ordinarily considered an implied health claim regarding heart disease:

> FDA also believes that the heart symbol has become so widely associated with prevention of heart disease that its use in the labeling of a dietary supplement would be ***ordinarily considered an implied heart disease prevention claim***. Consistent with the examples provided in the January 6, 1993, Federal Register document on health claims (58 FR 2486), however, there may be ***unusual*** cases in which, in context, the use of a heart symbol does not imply heart disease prevention.[33]

> * * *

> FDA agrees that in most cases, a picture of a healthy organ would not be considered a disease claim, if, in the context of the labeling as a whole, it did not imply treatment or prevention of disease. As described in response to comment 51 of section II.I of this document, however, ***there may be symbols for organs, like the heart symbol, that have become so widely recognized as symbols for disease treatment or prevention, their use in labeling would constitute an implied disease claim***.[34]

65.    Under the FDA's regulations, Defendant's use of the word "heart" (in "Heart Health" and "support[s] *heart* health")—along with Defendant's use of the heart symbol—constitute an implied health claim related to heart disease.

---

[32] Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body, 65 Fed. Reg. 10000, 1022 (Jan. 6, 2000) (codified at 21 C.F.R. pt. 101) (emphasis added).

[33] *Id*. (emphasis added).

[34] *Id*. at 1026 (emphasis added).

66.     Indeed, even the defense bar recognizes that the use of the heart symbol alone is sufficient to constitute an implied health claim:[35]



*(Exception: The preamble to the final rules indicate that use of the heart symbol on product label and labeling is an impermissible heart disease prevention claim.)*

67.     As a health claim, the Products' heart health representations must comply with specific rules and regulations that have been enacted by the FDA to prevent consumer deception.

68.     The FDA allows a limited number of health claims—either "authorized" health claims or "qualified" health claims.[36]

69.     Authorized health claims must follow the strict language proscribed by the FDA, but do not need to be "qualified" by a disclaimer. An example of an authorized health claim that is unqualified is, "Adequate calcium and vitamin D as part of a healthful diet, along with physical activity, may reduce the risk of osteoporosis in later life."[37]

70.     Because unqualified health claims have such a high influence on reasonable consumers, the FDA will only allow an ***unqualified*** health claim on a product label if the FDA "determines, based on the totality of publicly available scientific evidence

---

[35] Todd A. Harrison et al., *Permissible vs. Impermissible Structure/Function Claims for Dietary Supplements*, Venable LLP (2014), https://www.venable.com/files/upload/FDLI-Dietary_Supplements.pdf.

[36] *See Yamagata v. Reckitt Benckiser LLC*, 445 F. Supp. 3d 28, 32 n. 1 (N.D. Cal. 2020) (citing *Questions and Answers on Health Claims in Food Labeling*, Food & Drug Admin. ("FDA") (Mar. 10, 2020), https://www.fda.gov/food/food-labeling-nutrition/questions-and-answers-health-claims-food-labeling).

[37] 21 C.F.R. § 101.72.

(including evidence from well-designed studies conducted in a manner which is consistent with generally recognized scientific procedures and principles), that there is *significant scientific agreement*, among experts qualified by scientific training and experience to evaluate such claims, that the claim is supported by such evidence."[38]

71.    The FDA has authorized only 12 unqualified health claims since 1990.[39]

72.    The Products' implied health claims (i.e., heart health representations) have not been authorized by the FDA.[40]

73.    Because the Products' health claims are not authorized, the FDA requires that Defendant properly qualify the Products' health claims with an appropriate disclaimer to ensure that consumers are not misled by the level of scientific evidence that exists for the Products' heart health claims.

74.    "Qualified health claims are supported by some scientific evidence, but do not meet the significant scientific agreement standard. *To ensure that they are not false or misleading to consumers*, qualified health claims *must be* accompanied by a disclaimer or other qualifying language to accurately communicate the level of scientific evidence supporting the claim."[41]

75.    The FDA has required the following disclaimer for qualified health claims on Omega-3 supplements:

> . . . FDA will consider exercising enforcement discretion for the
> following qualified health claim: Supportive but not conclusive research

---

[38] 21 U.S.C. § 343(r)(3)(B)(i) (emphasis added); 21 C.F.R. § 101.14 (c).

[39] *See* 21 C.F.R. §§ 101.72-101.83.

[40] *Id.*

[41] *Questions and Answers on Health Claims in Food Labeling*, FDA (Dec. 13, 2017), https://www.fda.gov/food/food-labeling-nutrition/questions-and-answers-health-claims-food-labeling (emphasis added).

shows that consumption of EPA and DHA omega-3 fatty acids may reduce the risk of coronary heart disease.  One serving of [Name of the food] provides [  ] gram of EPA and DHA omega-3 fatty acids.  [See nutrition information for total fat, saturated fat, and cholesterol content.].

76.     Here, even though the Products' heart health representations are health claims, they were not qualified with a disclaimer that accurately conveys the level of scientific evidence/research that exists for the Products' heart health claims, as required by the FDA.

77.     While Plaintiff is not bringing this action to enforce the FDA's regulations, these FDA regulations were enacted specifically to prevent consumer deception.

78.     Thus, Defendant's failure to abide by the FDA's regulations further supports Plaintiff's allegations that reasonable consumers were misled about the level of scientific evidence/research that purportedly supports the Products' heart health claims.

79.     As the entity responsible for the development, manufacturing, packaging, labeling, advertising, distribution and sale of the Products, Defendant knew or should have known that the Products falsely and deceptively represent that they support heart health, and that there is conclusive research to support such a claim.

80.     Defendant also knew or should have known that Plaintiff and other consumers, in purchasing the Products, would rely on Defendant's front label heart health representations. Nonetheless, Defendant deceptively advertises the Products in order to deceive consumers and gain an advantage over other fish oil supplements that do not use deceptive claims like the heart health representations.

81.     Consumers are willing to pay more for the Products based on the belief that the Products will reduce their risk of heart disease, and that there is conclusive research to support such a claim. Plaintiff and other consumers would have paid significantly less for the Products, or would not have purchased them at all, had they known the truth about them. Thus, through the use of misleading representations, Defendant commands a price that Plaintiff and the Class would not have paid had they been fully informed. Therefore, Plaintiff and other consumers purchasing the Products have suffered injury in fact and lost money as a result of Defendant's false and deceptive practices, as described herein.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this class action pursuant to Fed. R. Civ. P 23 and all other applicable laws and rules, individually, and on behalf of all members of the following Classes:

**California Class**
All residents of California who purchased any of the Products within the applicable statute of limitation ("California Class").

**California Consumer Subclass**
All residents of California who purchased any of the Products for personal, family, or household purposes, within the applicable statute of limitations period ("California Consumer Subclass").

83.     The California Class and California Consumer Subclass are referred to collectively as the "Classes."

84.     Excluded from the Classes are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the

-22-

correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85.   Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or add subclasses before the Court determines whether class certification is appropriate.

86.   Plaintiff is a member of both Classes.

87.   **Numerosity:** Members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff but is likely to be ascertained by Defendant's records. At a minimum, there are likely thousands of Class members.

88.   **Commonality:** There are questions of law and fact common to the proposed class(es). Common questions of law and fact include, without limitations:

a. whether Defendant's course of conduct alleged herein violates the statutes and other laws that are pled in this Complaint;

b. whether reasonable consumers would rely upon Defendant's representations about the Products and reasonably believe the Products' Omega-3s support heart health;

c. whether reasonable consumers would rely upon Defendant's representations about the Products and reasonably believe there is— at least some—conclusive research showing that Omega-3 supplements like the Products reduce the risk of heart disease;

d. whether Defendant knew or should have known its representations were false or misleading;

e.  whether Defendant was unjustly enriched by retaining monies from the sale of the Products;

f.  whether certification of each Class is appropriate under Rule 23;

g.  whether Plaintiff and the members of each Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief; and

h.  the amount and nature of the relief to be awarded to Plaintiff and the Classes.

89.  **Typicality:** Plaintiff's claims are typical of the other Class members because Plaintiff, as well as Class members, purchased one of the Products and relied on the representations made by the Defendant about the Product prior to purchasing the Product. Plaintiff and the members of each Class paid for Defendant's Products and would not have purchased them (or would have paid substantially less for them) had they known that the Defendant's representations were untrue.

90.  **Adequacy:** Plaintiff will fairly and adequately protect the interests of the proposed Classes as her interests do not conflict with the interests of the members of the proposed Classes she seeks to represent, and she has retained counsel competent and experienced in class action litigation. Thus, the interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

91.  **Predominance:** Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Complaint predominate over any other questions affecting only individual members of the Classes. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is

required is a narrow focus on Defendant's misconduct detailed at length in this Complaint.

92.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Complaint/lawsuit. Further, because of the damages suffered by any individual Class member may be relatively modest in relation to the cost of litigation, the expense and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class members may be unaware that claims exist against the Defendant.

93.     **Declaratory and Injunctive Relief:** Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.

**FIRST CLAIM FOR RELIEF**
**Violation of California's Consumers Legal Remedies Act**
**California Civil Code § 1750, *et seq*.**
**(*For the California Consumer Subclass*)**

94.     Plaintiff repeats the allegations contained in paragraphs 1-93 above as if fully set forth herein.

95.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Consumer Subclass against Defendant pursuant to California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*

96.     The Products are "good[s]" within the meaning of Cal. Civ. Code § 1761(a), and the purchases of the Products by Plaintiff and members of the California Consumer Subclass constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

97.     Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have. . . ." By using the heart health representations on the front label of the Products, Defendant has represented and continues to represent that the Products have sponsorship, approval, characteristics, uses, and benefits (i.e., that the Products support heart health and that there is sponsorship and approval in the form of conclusive research for such a claim) that they do not have. Therefore, Defendant has violated section 1770(a)(5) of the CLRA.

98.     Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By using the heart health representations on the front label of the Products, Defendant has represented and continues to represent that the Products are of a particular standard, quality, or grade (i.e., that the Products support heart health and have conclusive research to support such a claim) that they do not meet. Therefore, Defendant has violated section 1770(a)(7) of the CLRA.

99.     Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services

-26-

with intent not to sell them as advertised." By using the heart health representations on the front label of the Products, and not delivering Products that support heart health or that have been shown through conclusive research to reduce the risk of heart disease, Defendant has advertised the Products with characteristics it intended not to provide to consumers. As such, Defendant has violated section 1770(a)(9) of the CLRA.

100.   At all relevant times, Defendant has known or reasonably should have known that the heart health representations on the front label of the Products are false and deceptive, and that Plaintiff and other members of the California Consumer Subclass would reasonably and justifiably rely on these representations when purchasing the Products. Nonetheless, Defendant deceptively advertises the Products as such in order to deceive consumers into believing the Products support heart health, and that there is conclusive research supporting such a claim.

101.   Plaintiff and members of the California Consumer Subclass have justifiably relied on Defendant's misleading representations when purchasing the Products. Moreover, based on the materiality of Defendant's misleading and deceptive conduct, reliance may be presumed or inferred for Plaintiff and members of California Consumer Subclass.

102.   Plaintiff and members of the California Consumer Subclass have suffered and continue to suffer injuries caused by Defendant because they would have paid significantly less for the Products, or would not have purchased them at all, had they known that the Products do not support heart health, and that there is no conclusive research supporting such a claim.

103.    Under Cal. Civ. Code § 1780(a), Plaintiff and Class members currently seek injunctive relief for Defendant's violations of the CLRA.

104.    Plaintiff mailed notice to Defendant of their CLRA violations pursuant to Cal. Civ. Code § 1782 on March 5, 2024. If within 30 days of receipt, Defendant does not agree to rectify the problems identified herein, Plaintiff will amend this Complaint to seek damages pursuant to Cal. Civ. Code § 1780 individually, and on behalf of the members of the Classes.

105.    Pursuant to Cal. Civ. Code § 1780(d), a declaration of venue is attached to this Complaint.

**SECOND CLAIM FOR RELIEF**
**Violation of California's False Advertising Law**
**California Business & Professions Code § 17500,** *et seq*
**(*For the California Class*)**

106.    Plaintiff repeats the allegations contained in paragraphs 1-93 above as if fully set forth herein.

107.    Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant pursuant to California's False Adverting Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

108.    The FAL makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

109.   Defendant has represented and continues to represent to the public, including Plaintiff and members of the proposed California Class, through its deceptive labeling and advertising, that the Products support heart health, and that there is conclusive research supporting such a claim. Because Defendant has disseminated misleading information regarding the Products, and Defendant knows, knew, or should have known through the exercise of reasonable care that the representations were and continue to be misleading, Defendant has violated the FAL.

110.   As a result of Defendant's false advertising, Defendant has and continues to unlawfully obtain money from Plaintiff and members of the California Class. Plaintiff therefore requests that the Court cause Defendant to restore this fraudulently obtained money to Plaintiff and members of the proposed California Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from violating the FAL or violating it in the same fashion in the future as discussed herein. Otherwise, Plaintiff and members of the proposed California Class may be irreparably harmed and/or denied an effective and complete remedy.

### THIRD CLAIM FOR RELIEF
**Violation of California's Unfair Competition Law ("UCL"),
California Business & Professions Code § 17200, *et seq.*
(*For the California Class*)**

111.   Plaintiff repeats the allegations contained in paragraphs 1-93 above as if fully set forth herein.

112.   Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant.

113.   The UCL, Cal. Bus. & Prof Code § 17200, provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

114.    Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law. Defendant's false and misleading advertising of the Products was and continues to be "unlawful" because it violates the CLRA the FAL. Defendant's health claims are also "unlawful" under federal laws and regulations, including 21 U.S.C. § 343(r)(3)(B)(i); 21 C.F.R. § 101.14 (c), and the FDA's requirements regarding qualified health claims, as described herein. As a result of Defendant's unlawful business acts and practices, Defendant has unlawfully obtained money from Plaintiff and members of the proposed California Class.

115.    Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims. Defendant's conduct was and continues to be of no benefit to purchasers of the Products, as it is misleading, unfair, unlawful, and is injurious to consumers who rely on the Products' labeling. Deceiving consumers into believing they will receive a Product(s) that supports heart health, and that has conclusive research to support such a claim, is of no benefit to consumers. Therefore, Defendant's conduct was and continues to be "unfair." As a result of Defendant's unfair business acts and practices, Defendant has and continues to unfairly obtain money from Plaintiff and members of the proposed California Class.

116.    Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public. Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products support heart health and that there is conclusive research supporting such a claim. Because Defendant misled Plaintiff and members

of the California Class, Defendant's conduct was "fraudulent." As a result of Defendant's fraudulent business acts and practices, Defendant has and continues to fraudulently obtain money from Plaintiff and members of the California Class.

117.   Plaintiff requests that the Court cause Defendant to restore this unlawfully, unfairly, and fraudulently obtained money to her, and members of the proposed California Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from violating the UCL or violating it in the same fashion in the future as discussed herein. Otherwise, Plaintiff and members of the proposed California Class may be irreparably harmed and/or denied an effective and complete remedy.

**FOURTH CLAIM FOR RELIEF**
**Breach of Express Warranty**
**Cal. Com. Code § 2313**
**(*For the California Class*)**

118.   Plaintiff repeats the allegations contained in paragraphs 1-93 above as if fully set forth herein.

119.   Plaintiff brings this claim individually and on behalf of the members of the California Class against Defendant.

120.   California's express warranty statutes provide that "(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

121.   Defendant has expressly warranted on the Products' front label that they support heart health, and that there is conclusive research supporting such a claim.

However, as alleged herein, these express representations are false and misleading, as the Products do not support heart health, and there is no conclusive research supporting such a claim.

122.   Defendant's representations about heart health on the Products' front labels are: (a) affirmations of fact or promises made by Defendant to consumers that the Products support heart health, and that there is conclusive research supporting such a claim; (b) became part of the basis of the bargain to purchase the Products when Plaintiff and other consumers relied on the representations; and (c) created an express warranty that the Products would conform to the affirmations of fact or promises. In the alternative, the representations about the Products are descriptions of goods which were made as part of the basis of the bargain to purchase the Products, and which created an express warranty that the Products would conform to the product descriptions.

123.   Plaintiff and members of the California Class reasonably and justifiably relied on the foregoing express warranties, believing the Products support heart health, and that there is conclusive research supporting such a claim.

124.   Defendant has breached the express warranties made to Plaintiff and members of the California Class by failing to provide the Products as represented on the front label.

125.   Plaintiff and members of the California Class paid a premium price for the Products but did not obtain the full value of the Products as represented. If Plaintiff and members of the California Class had known of the true nature of the Products, they would not have been willing to pay the premium price associated with them. As a result, Plaintiff and members of the California Class suffered injury and deserve to

recover all damages afforded under the law.

126.   On March 5, 2024, the undersigned counsel notified Defendant of its breach of warranty by way of a notice letter outlining the foregoing allegation.

### FIFTH CLAIM FOR RELIEF
### Breach of Implied Warranty
#### (*For the California Class*)

127.   Plaintiff repeats the allegations contained in paragraphs 1-93 above as if fully set forth herein.

128.   Plaintiff brings this claim individually and on behalf of the members of the California Class against Defendant.

129.   California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

130.   California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any." Cal. Com. Code § 2314(2)(f).

131.   Defendant is a merchant with respect to the sale of Products. Therefore, a warranty of merchantability is implied in every contract for sale of the Products to California consumers.

132.   By advertising the Products with representations about heart health on the Products' front label, Defendant made an implied promise that the Products support heart health, and that there is conclusive research supporting such a claim. However, the Products have not "conformed to the promises. . . made on the container or label" because the Products do not support heart health, and there is no conclusive

research supporting such a claim. Plaintiff, as well as other California consumers, did not receive the goods as impliedly warranted by Defendant to be merchantable. Therefore, the Products are not merchantable under California law and Defendant has breached its implied warranty of merchantability in regard to the Products.

133.   If Plaintiff and members of the California Class had known that the Products' heart health representations were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Defendant's breach, Plaintiff and members of the California Class have suffered injury and deserve to recover all damages afforded under the law.

134.   On March 5, 2024, the undersigned counsel notified Defendant of its breach of warranty by way of a notice letter outlining the foregoing allegation.

**SIXTH CLAIM FOR RELIEF**
**Quasi Contract/Unjust Enrichment/Restitution**
***(for the California Class)***

135.   Plaintiff repeats the allegations contained in paragraphs 1-93 above as if fully set forth herein.

136.   Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendant.

137.   As alleged herein, Defendant has intentionally and recklessly made misleading representations to Plaintiff and members of the California Class to induce them to purchase the Products. Plaintiff and members of the California Class have reasonably relied on the misleading representations and have not received all of the benefits and promises (that the Products would support heart health, and that there was conclusive research supporting such a claim) made by Defendant through the Products' representations. Plaintiff and members of the proposed California Class

-34-

have therefore been induced by Defendant's misleading and deceptive representations about the Products, and paid more money to Defendant for the Products than they otherwise would and/or should have paid.

138.   Plaintiff and members of the proposed Classes have conferred a benefit upon Defendant as Defendant has retained monies paid to them by Plaintiff and members of the proposed Classes.

139.   The monies received were obtained under circumstances that were at the expense of Plaintiff and members of the proposed Classes—i.e., Plaintiff and members of the proposed Classes did not receive the full value of the benefit conferred upon Defendant. Therefore, it is inequitable and unjust for Defendant to retain the profit, benefit, or compensation conferred upon them.

140.   As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and members of the proposed Classes are entitled to restitution, disgorgement, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant from its deceptive, misleading, and unlawful conduct as alleged herein.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Classes, respectfully prays for following relief:

A.     Certification of this case as a class action on behalf of the proposed Classes defined above, appointment of Plaintiff as Class representative, and appointment of her counsel as Class Counsel;

B.     A declaration that Defendant's actions, as described herein, violate the claims described herein;

C.     An award of injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the proposed Classes, including, *inter alia*, an order prohibiting Defendant from engaging in the unlawful acts described above;

D.     An award to Plaintiff and the proposed Classes of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the proposed Classes as a result of its unlawful, unfair and fraudulent business practices described herein;

E.     An award of all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct;

F.     An award of nominal, punitive, and statutory damages;

G.     An award to Plaintiff and her counsel of reasonable expenses and attorneys' fees;

H.     An award to Plaintiff and the proposed Classes of pre and post-judgment interest, to the extent allowable; and

I.     For such further relief that the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, individually, and on behalf of the proposed Classes, hereby demands a jury trial with respect to all issues triable of right by jury.

1   DATED: March 6, 2024                    **TREEHOUSE LAW, LLP**

2                                           By:  /s/ Ruhandy Glezakos

3

4                                           Ruhandy Glezakos (SBN 307473)
                                            Benjamin Heikali (SBN 307466)
5                                           Joshua Nassir (SBN 318344)
                                            2121 Avenue of the Stars, Suite 2580
6                                           Los Angeles, CA 90067
                                            Telephone: (310) 751-5948
7                                           rglezakos@treehouselaw.com
                                            bheikali@treehouselaw.com
8                                           jnassir@treehouselaw.com

9
                                            *Attorneys for Plaintiff and the*
10                                          *Putative Classes*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-37-

## Venue Declaration Pursuant to Cal. Civ. Code 1780(d)

I, Pearl Magpayo, declare as follows:

1.     I am the named Plaintiff in the above-captioned action and a citizen of the State of California. I have personal knowledge of the facts set forth in this declaration, and am competent to testify to the same. The matters set forth herein are true and correct to the best of my knowledge and belief.

2.     I believe that the Northern District of California is the proper place for trial of this case because I reside in this District and I purchased one of the Products at issue in this case in this District. Thus, a substantial part of the events or omissions giving rise to the claims at issue in this case occurred in this District.

I declare under penalty of perjury that the foregoing is true and correct, executed on ___03/04/2024___ in Hayward, California

_____

Pearl Magpayo